*Circuit Court of the United States, District of Columbia,*
*May Term,* 1823.

In the case of Levi S. Burr, an Attorney of this Court.

The facts of this case, and the law, may be learned from
the following decision :

*Cranch, Chief Justice.*—In the argument of a cause in
this court, Mr. Burr was charged, by counsel of great re-
spectability, with practices unbecoming a practitioner at
the bar. It was said that those charges were not made
unadvisedly, and could be supported. Mr. Burr denied
the truth of the allegations, and challenged an investiga-
tion. The court thought it important to the character,
both of the accused and the accusing party, as well as to
the purity of the administration of justice, that charges
so deliberately made, should not pass without notice.—
They, therefore, requested the gentleman who had made
the accusation, to state the charges in writing. This
was done in the form of a letter to Mr. Burr in these
words :

" Sir : The circumstances which I considered as jus- Charges.
tifying and obliging me to make the observations I did
to the court to-day, are these : My own observations
of your conduct in Alexandria, relative to the letter of
Benjamin F. Clarke, produced in the trial of that cause,
which you stated, resembled the writing of a letter in
your possession, from a man of that name. Information
which I have received this term, from Mr. G. H. Gloyd,
and several other persons, relative to your advising a man
in jail, who was either a recognized witness or defend-

ant, for whom some person was special bail, to run away.

Information received from Mr. Beale and others, relative to your instituting a suit or suits against a Mr. Henshaw for some person, without any authority from the said plaintiff for so doing.

Information received from Mr. Van Ness, and several others, and confirmed by the appearance docket of this term, of your bringing many frivolous and vexatious suits, and many of them for persons utterly insolvent.

Information received from Mr. Ringgold, Mr. Dawson, and others, of your soliciting Capt. Crabb for his business, and appearing for him without authority ; and, particularly, for Charles Burns, as stated by him.

Information from Mr. Golding, and the evidence of his boy, about the account in bar filed by you against his account against you, in the case in which you were warranted.

Information from Mr. Van Ness, as to your purchasing in a lot, at a trustee sale of Patrick Nicholson, an insolvent's estate, under unfair and improper circumstances.

Information from Mr. Beale, and Mr. Waters, as to your making fictitious claims, and bringing suits, with a vew to extort money ; also, to taking a bill of sale from ————, who was about to be distrained for rent by Thady Hogan, to prevent such distress; and taking an order 'from Patrick Nicholson, on the Corporation, for 80 or 90 dollars, for writing his insolvent papers, he, the said Nicholson, being in jail, and imposed upon in obtaining said order.

Information as to your conduct in soliciting business at the jail, and of other persons, and general reputation as to your ill conduct in your profession.

Above I have stated the circumstances and reports to which I have alluded, and if you can explain them, or show them to be ill-founded, I will gladly acknowledge that I have done you injustice.

Yours,

F. S. KEY.

April 26th, 1823."

The court supposing that the only ground of their jurisdiction to investigate the matter, by an examination of witnesses, was its discretionary power to admit Attorneys and Counsellors to practice in the court, and to exclude them from practising for improper conduct, made the following order :

" The foregoing suggestion of charges having been Order of the made to this court, of the improper conduct of Levi S. court. Burr, one of the Attorneys of this Court. It is ordered, that the said Levi S. Burr show cause, on the third day of May next, why his name should not be struck off the roll of Attorneys of this court."

On the 5th of June (there having been an intervening adjournment of the court) the cause came on to be heard ; and, before the examination of witnesses, Mr. Burr read to the court a paper which he termed a representation Remonstran'e and remonstrance, in which he stated that he objected to the investigation, because the charges were not exhibited against him upon oath ; but did not object to the investigation of charges properly brought before the court.— He seemed to think that the power of the court is limited to his official acts as an attorney, and perhaps to such only as should have been committed in violation of some express rule of court. To the first charge, he objected that it contained no specific allegation of any thing improper. To the second, that it was contradictory and

absurd in itself; and denied that he advised any witness or other person to run away. To the third, which related to his bringing an action against Mr. Henshaw without authority from the plaintiff, he answered that he conceived himself to have been authorized by the plaintiff so to do, or he would not have done it; and that the plaintiff has sustained no injury. To the fourth allegation, which charges him with having brought many frivolous and vexatious suits for insolvent persons, he answers, that the question whether the suits were frivolous and vexatious, cannot be ascertained until they shall have been tried. To the fifth allegation, which charges him with soliciting business from Capt. Crabb, and appearing for him and other persons without authority, he answers, that it is no offence to solicit business, and that he supposed himself authorized to appear in the cases referred to; that no improper motive is charged, and no injury alleged to have been sustained by any person. To the sixth, which relates to the account in bar, filed in Golding's case, he answers, that the judgment of the justice of the peace was in his favor, and that this court reversed the judgment, because it had been decided by this court that a counsellor's fee for advice could not be recovered in a suit at law, and, therefore, did not form a legal set-off to the plaintiff's demand. He states that he had no knowledge of such a decision; but supposed he had a good right to make the set-off. To the seventh, which relates to his purchasing a lot at the trustee's sale of P. Nicholson's estate, he objects, that it is a charge against him as a private citizen, and not as a member of the bar; and that, in regard to it, he cannot be deprived of his trial by jury —he objects, also, that the nature of the "unfair and improper circumstances" is not stated. To the eighth,

which relates to his making fictitious claims, and bringing suits with a view to extort money—the taking a bill of sale to prevent the distress of T. Hogan for rent—and imposing upon P. Nicholson, by taking an order from him on the corporation for 80 or 90 dollars, for writing his insolvent papers; he objects, that the first allegation is too vague and indefinite to be answered. That the other two allegations contained in this charge, relate to him as a citizen, and not as an attorney of this court, and involve facts which çan only be ascertained by jury, and that if either of those persons has been injured, redress is open to him in the common way. To the ninth, which relates to soliciting business at the jail, and from other persons, and to his general reputation as to his ill conduct in his profession, he answers that, as to his soliciting business, there is nothing improper in it, in itself, nor is any thing improper alleged; and as to general reputation, it is too vague a charge to be specifically answered; but, he fears not to meet it. The remonstrance concludes with these words :

" Having thus waded through this congregated mass of absurdities, it only remains for a remonstrance and pro-test to be made against them—which is hereby solemnly made :

" Because the charges are not sufficiently explicit ;

" Because they are untechnically and inartificially made ;

" Because they are too inquisitorial, particularly as to matters of fact ;

" Because they carry prejudice and malignity on the very face of them ;

" Because they have not been exhibited on oath ;

" Because they prejudge facts, which can only be established by the verdict of a jury ;

" Because they are illiberal, uncharitable, and unbecoming a christian community ;

" Because they breathe, throughout the whole of them, a spirit of intolerance ;

" Because they are calculated to entrap ;

" Because they cannot be fairly answered ; and,

" Because they are untrue."

No preliminary question having been made, to the court, the witnesses were examined on the 5th, 6th, and 7th of June. At the close of the testimony, Mr. Hay asked leave to make some observations upon the power of the court to proceed in this manner against an attorney of the court, and Wednesday, the 11th of June, was assigned for hearing his argument.

Mr. Hay contended, that this was a criminal prosecution of a high grade ; that the facts ought to be precisely stated, and must show that an offence has been committed ; and that no accusation ought to be heard, but such as related to the' conduct of Mr. Burr as an attorney of this court.

Arguments for the defendant. After commenting upon the nature of the allegations, which he considered as comprehending thirteen distinct charges, he denied that this summary mode of investigation was warranted by the constitution of the United States ; and cited the second section of the third article, which declares, that the trial of all crimes shall be by jury, except in cases of impeachment; and those amendments of the constitution which provide, that no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment by a grand jury, except cases arising in the land or naval forces ; and that, in all criminal prosecutions, the party shall enjoy the

benefit of the trial by jury. He contended that the courts of the United States have no power to punish contempts in a summary manner; that the act of congress, which gives them that power, is unconstitutional, because repugnant to the clauses of the constitution before mentioned; that the powers of this court are, (by the third section of the act of 27th February, 1801,) limited by the powers given to the courts of the United States; that if the acts of congress, which give the courts of the United States the power to punish contempts, were constitutional, it would only authorize these courts to punish them by fine and imprisonment, not by suspension or deprivation of office; and would not authorize the punishment of contempts not committed in the immediate presence of the court; that this court has no power but what is expressly given, and cannot expel an attorney from the bar.

The power of this court to expel an attorney from the bar having been, now, for the first time, questioned, it is proper to inquire upon what ground it rests. By the act of congress of the 27th of February, 1801, it is provided, that the laws of Maryland, as they then existed, should continue in force in that part of the District of Columbia which was ceded by the State of Maryland to the United States. Those laws consisted of the common law of England, such of the statutes as existed at the time of the first emigration to Maryland, and which, by experience, had been found applicable to the local and other circumstances of the inhabitants; and of such other statutes as have been since made in England, or Great Britain, and have been introduced, used, and practised, by the court of law or equity, and of the constitution, bill of rights, and acts of assembly

*The common law of England in relation to attorneys if in force in the District of Columbia, as far as those laws are applicable to the local situation of the district.*

of that State, as modified by the constitution and laws of the United States. It follows, therefore, that the laws of England, respecting attorneys of courts, as well in relation to their rights, privileges, and duties, as to the power of the courts over them, so far as those laws were found applicable to the local and other circumstances of the country, are in force in this part of the District of Columbia.

Ante, p. 337, 338.

It is said, that, in ancient times, by the law of England, those of authority in courts, had it in their power whether they would suffer men to appear, or sue, by any other than themselves; the courts, therefore, had a right to say by what attorney the party should appear; afterwards, however, it became customary for parties to obtain the King's writ, commanding the courts to admit them to appear by attorneys specially named in the writ. Subsequent statutes, however, (West. 2. c. 10. &c.) gave to all persons a liberty of appearing and appointing an attorney, as if they had letters patent. As this liberty soon became abused, by the appointment of ignorant attorneys, the stat. of 4. H. 4. c. 18. was enacted in the year 1402 ; it is entitled "The punishment of an attorney found in default," and in these words : "Item.—For Sundry damages and mischiefs that have ensued before this time, to divers persons of the realm, by a great number of attorneys, ignorant and not learned in the law, as they were wont to be before this time, it is ordained and established, that all the attorneys shall be examined by the justices, and by their discretion their names put upon the roll ; and they that be good and virtuous, and of good fame, shall be received, and sworn well and truly to serve in their offices ; and, especially, that they make no suit in a foreign country ; and the other attorneys shall be put out

by the discretion of the said justices; and that their masters, for whom they were attorneys, he warned to take others in their places, so that in the mean time no damage or prejudice come to their said masters; and if any of the said attorneys do die, or do cease, the justices for the time being, by their discretion, shall make another in his place, which is a virtuous man, and learned, and sworn in the same manner as afore is said. And if any such attorney be hereafter notoriously found in any default, of record or otherwise, he shall forswear the court, and never after be received to make any suit in any court of the King. And that this ordinance be holden in the exchequer, after the discretion of the treasurer and of the barons there." This statute was in force in Maryland in the year 1801, as appears by the report of Chancellor Kilty, made by authority of an act of the legislature of that State.

The power of the courts, in their discretion to admit and expel attorneys, has been recognized by many subsequent statutes and judicial decisions; and in the year 1715, the assembly of Maryland passed an act, (c. 38.) by the 12th section of which it is enacted, that " no attorney or other person whatsoever shall practice the law in any of the courts of this province without being admitted thereto by the justices of the several courts, who are hereby empowered to admit and suspend them, (*salvo jure corronæ*) until his majesty's pleasure shall be known therein."

*Power of the courts to admit and expel attorneys.*

And in 1719, the legislature of Maryland passed another act, (c. 4.) by the second section of which it is enacted, "that the several magistrates, judges of the several courts within this province, be, and are hereby authorized and strictly required, to observe the demeanor of all

practitioners of the law before them, as well as all minis-
terial officers, or other persons who shall use any inde-
cent liberties to the lessening the grandeur and author-
ity of their respective courts, and to discountenance and
punish the same, according to the nature of the defence,
either by suspending such practitioners of the law, from
their practice, perpetually, or for a time, or to punish such
practitioners, or ministerial officers, or other persons, by
fine, at the discretion of such court, before whom such
offence shall be committed, not exceeding 4,000 lbs. of to-
bacco, in the superior courts, nor 2,000 lbs. of tobacco in
the several county courts, within this province, on each
offender for any one offence." And by the 10th section
it is provided, "that nothing in this act shall be constru-
ed to lessen the authorities vested by law in the several
courts, or in any of the magistrates, before the making

_Ante, p. 336. of this act." By the law of England, recognized as the
law of Maryland by the courts of that State, attorneys
are officers of the court, and are liable to be punished in
a summary way, either by attachment or having their
names struck out of the roll of attorneys for any ill practice
attended with fraud and corruption, and committed
against the obvious rules of justice and common honesty ;
but it is said that the court will not easily be prevailed on
to proceed in this manner, if it appears that the matter
complained of was rather owing to neglect or accident
than design.

Process agin't      Hawkins, (b. 2. c. 22. sec. 6.) speaking of the pro-
attorneys, for cess of attachment against attorneys, says, there is no
what cause.
doubt the court may so proceed against them for taking
upon them to prosecute or defend a suit for another,
without any manner of directions from him ; but it is
not usual to grant attachments in these cases without

some apparent circumstances of fraud or corruption. So attachment lies against them for injustice done to their clients; as for protracting suits by little shifts and devices; putting parties to unnecessary expenses to increase their fees; or demanding fees for business which was never done; or for refusing to deliver up to their clients writings with which they had been intrusted in the way of business; or money which has been recovered and received by them to their client's use; and for such like gross and palpable abuses. But it will not interfere in this manner (at the instance of the injured party) as to any writings or money received by an attorney on any other account, except only in his way of business as an attorney, but will leave the party to his ordinary remedy by action. The court will also proceed by attachment against attorneys, not only for disobedience of its rules after notice of such rules, either expressed or implied; but also for any such ill practice as is against the known and obvious rules of justice and common honesty; as for forging a writ, or any other matter of record, or but attempting to do so; or for taking out a capias which has no original to warrant it; or for endeavoring to impose on the court; or for giving directions to a sheriff concerning what persons he should return on the panel; and for other misdemeanors of the like nature. In all these cases the courts proceed by attachment at the instance of the party injured. It was said in argument that courts will inquire only of the official acts of their attorneys, *as attorneys.*

But can it be said that if an attorney should be convicted of highway robbery or larceny, or forging, or any other infamous crime, grossly dishonest conduct, the court must close its eyes? Must refrain from inquiry? Is

*Margin notes:* Ante, p. 335, 336, 337; When the court will interfere. When not. Ante, Striker's case, p. 334, 335. Niven's case, 336 and als' M'Clelan' case, p. 319.

not the respectability of the court, in some measure, connected with that of the bar ?    A regard to the purity of the administration of justice demands that the bar should be pure and honest ; and, if possible, highly honorable.

The members of the bar act in this country in the double capacity of attorneys and counsellors.    As counsellors, the court reposes in them great confidence.    It cannot doubt their honor and integrity, and it is the duty of the court to see that they conduct themselves in such a manner as to deserve that confidence.

This is not a new doctrine.    In the case of *Brownsall;* Cowp. 829. application was made to the court of king's bench in England, to strike the defendant off the roll of attorneys, he having been convicted of stealing a guinea five years before the application ; and having been burnt in the hand and suffered five years imprisonment, and no misconduct *since* having been imputed to him.    It was contended that the benefits of clergy which he had received, and his burning in the hand operated as a statute pardon ; and that to strike him off the roll would be to punish him twice for the same offence.

*Ante, p. 336.*

*Lord Mansfield* said, " this application is not in the nature of a second trial, or a new punishment.    But the question is, whether, after *the conduct of this man, it is proper that he should continue a member a of profession,* which should stand free *from all suspicion.*    Suppose he had been a justice of the peace, the conviction itself would not remove him from the commission ; but could there be a doubt that he ought to be struck out of the commission ?    As at present advised, I am of opinion, *without any doubt,* that the rule should be made absolute.    But as it is for the dignity of the profession that a solemn

opinion should be given, we will take an opportunity of mentioning it to all the judges."

The Reporter afterwards says, Lord Mansfield on this day said, " We have consulted all the judges upon this case, and they are unanimously of opinion, that the defendant's having been burnt in the hand is no objection to his being struck off the roll ; and it is on this principle *that he is an unfit person to practice as an attorney.* It is not by way of *punishment; but the court, in such cases, exercise their discretion whether a man whom they have formerly admitted, is a proper person to be continued on the roll or not.* Having been convicted of felony, we think the defendant is not a fit person to be an attorney. Therefore, let the rule be made absolute." That case was decided in the year 1778, and shows what the law in England was at the time of our separation.    The law in Maryland was the same and so continued to the 27th of February, 1801, when the county of Washington was finally separated from the state of Maryland.

That case decides the principle that the court will strike from the roll an attorney, who, by his conduct, although not official, has shown himself not to be a fit person to be an attorney.    We think the same doctrine prevails in Virginia.    In *Leigh's* case (1 *Munford's Reports,* 481.) Judge Roane says, " With respect to these public attorneys, or attorneys at law, in order to secure a due degree of probity and knowledge in their profession, so indispensable to persons acting in that character, none are *permitted* to act as such but those who are allowed by the judges to be skilled in the law, and certified by the court of the county of their residence to be persons of honesty, probity, and good demeanor.    Having obtained the sanc-

tion of these two tribunals, touching these two particulars, an attorney is *licensed* or *allowed* to practice, and the court have also a continuing control over them, with power to revoke their licenses for *unworthy* practices or behavior.

*These cases are not reported.*

In our own court three cases have occurred in which the court has ordered the name of an attorney to be stricken from the roll.

The first of these cases was on a conviction for forgery, on the 31st of January, 1805.

*Bigelow's case in the mayor's court at Philadelphia, June, session, 1820. He was found guilty of a conspiracy to defraud, & sentenced to 3 years hard labor in the state prison. The courts, by an inspection of the record of the mayor's court struck his name from the roll of attorneys.*

The second was on a verdict of a jury, 2d of February, 1811, " for practices derogatory to the high and honorable character which an attorney of this court ought to maintain, in colluding with, and knowingly assisting a debtor to defraud his creditors under color of law."

The third was on an indictment, for some dishonest conduct, January, 1813. The jury returned a verdict of guilty. The court, however, arrested the judgment, because the offence charged was indictable at common law. But the court, without hesitation, ordered his name to be stricken from the roll of attorneys. In neither of those cases was the power of the court called in question. But it was said at the bar, that no court in this country has any power but what is expressly given by statute ; that such is the law of England in regard to all new tribunals, that, by the act of congress of 27th of February, 1801, by which this court was erected, its powers and the powers of its judges are limited by the powers given to th courts of the United States then in existence, and it can exercise no other ;· and that among those powers, that of expelling an attorney is not given ; and that the

clause of the judiciary act which authorizes the courts of
the United States to punish contempts by fine and im-
prisonment, if it be construed to include the summary
jurisdiction, is in that respect, unconstitutional. In an-
swer to this, it may be said, that no express power is
given to the courts of the United States to *admit* attor-
neys in civil causes; and there seems to be no reason why
they should not have as good a right to expel as to ad-
mit. Can it be imagined, that if a court, without author-
ity, permit an attorney to practice in that court, it has
no power to revoke such permission, if it finds itself im-
posed upon in regard to the skill or integrity of the at-
torney?

*If the courts have power to admit attorneys, they have power to expel.*

An act of the assembly of Maryland, applicable to all
the courts, is as much the law of Maryland as any other
act of assembly, and is not the less law because it con-
fers certain powers on the courts. So, also, is an act of
the legislature of Maryland, in regard to the admission
and expulsion, the right and duties of attorneys. The
act of Congress of the 27th of February, 1801, constitut-
ing this court, has not said that it shall have no other
powers than those given to the other courts of the United
States. By the first section of that act it is declared,
that the laws of Maryland should remain in force in this
part of the district. Among those laws were many re-
lating to the powers and jurisdiction of courts; some of
those laws were acts of assembly; some were English,
and some were British statutes; some were parts of the
common law of England, and some were constitutional
provisions. Congress probably knew, or supposed that
there might be powers which had been given to the courts
of the United States which did not belong to the state
courts of Maryland; and as this court was to be a sub-

*Construction of the act of congress of the 27th February, 1801, constituting the circuit court of the United States for Washington county, District of Columbia.*

stitute for both state and United States' courts, it was necessary to give it the jurisdiction of both. It is, therefore, a reasonable, if not a necessary construction of the act of Congress, to consider it as intending to superadd the powers of the courts of the United States to those of the state courts. This has been the uniform and universal construction given to the act by this court, and a great, perhaps the greater part of the jurisdiction it has exercised during the whole period of its existence, depends upon that construction. If, therefore, the principle be admitted that all the courts in this country are new tribunals, and that no new tribunal can exercise a power not expressly granted, we think that congress, by adopting the laws of Maryland, without restriction, have expressly granted to this court all the powers of a general nature which, by the laws of Maryland, were conferred upon courts of similar jurisdiction ; and, among the rest, those powers which, by the laws of Maryland, were given to the courts of that state to admit and expel attorneys.

As the court feels great confidence in the correctness of this construction of the act of Congress, upon which its powers depend, we deem it unnecessary to resort to the analogy which may be supposed to exist between the present proceeding and an attachment for a contempt of court, and to justify it under that section of the judiciary act of 1789, which is supposed to give to the courts of the United States a summary jurisdiction in cases of contempt.

But it has been said in argument that this must be considered as a *criminal prosecution,* and that Mr. Burr is, therefore entitled to all the privileges secured by the constitution of the United States to persons so prosecuted. The argument intended to prove that this is a criminal

prosecution is understood to be substantially this ; that, as this court might, by the law of England, have proceeded by attachment of contempt against the attorney, as for a constructive contempt of court, it ought to be so considered ; and if it had been attachment of contempt, it would have been a criminal prosecution, and the party is therefore entitled to a trial by jury. But the court cannot admit that it can be considered as an attachment ; and if it could be so considered, the court cannot admit that the party would be entitled to a trial by jury.

The object of an attachment of contempt is to punish the offender by fine and imprisonment. The object of the present proceeding is to purify the bar ; and the utmost power which the court can exercise against the party in this proceeding, is to strike his name from the roll. In cases of attachment, the party has a right to exculpate himself upon oath; in the present case he has not ; and indeed, this is made a subject of complaint. It seems to the court too plain for argument that this is not, and cannot be considered as an attachment of contempt. But if it were, we do not think that the party would be entitled to a trial by jury. The clauses of the constitution of the United States relied upon by the counsel in argument were, that part of the 2d sec. of the 3d article which is in these words ; " The trial of all crimes, except in cases of impeachment, shall be by jury." And the 5th amendment, which declares " that no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger ; nor shall any person for the same offence

*Marginal notes:* Object of the proceeding to purify the bar. Proceedings not considered in the nature of an attachment for a criminal proceeding, and therefore the clauses in the constitution relating to trial by jury,&c. do not apply.

be twice put in jeopardy of life or limb ; nor shall he be compelled, in any criminal case, to be witness against himself; nor be deprived of life, liberty, or property, without due process of law ; nor shall private property be taken for public use without just compensation." And the 6th amendment, which declares, " That, in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed ; which district shall have been previously ascertained by law ; and to be informed of the nature and cause of the accusation ; to be confronted with the witnesses against him ; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.

Object of the inquiry whether the court in their discretion would revoke the permission heretofore given to Mr. Burr to practice as an attorney in this court.

This part of the argument did not seem to the court to bear much upon the subject before us, which was not considered as either an attachment for a contempt, or a criminal prosecution ; but simply as an inquiry whether the court in the exercise of its discretion, should not revoke the permission heretofore given to Mr. Burr to practice as an attorney in this court. The court, however, will observe, that the clauses of the constitution of the United States, which have been cited, are in substance as it is believed, contained in many, if not all, of the constitutions of the several states ; and even in the celebrated *magna charta* of England. Yet the courts of England, and, it is believed, the courts of all the states, as well as of the United States, during the whole period of their existence, have claimed and exercised the power of punishing contempts in a summary manner ; and in those states which have courts of chancery, the greater part of the compulsory process of such courts is grounded entirely

upon that power. This court has exercised it ever since NEW-YORK, its creation; and its right has never before been questioned.

We do not think it necessary to cite authorities to prove that this power has been exercised by the courts of the several States. The fact is known to every person in the least conversant with judicial proceedings; and to show that it claimed by the courts of the United States, we shall cite only two cases decided by the supreme court of the United States.

The first is that of Anderson v. Dunn, decided in 1821, and reported by Mr. Wheaton. In that case the judge delivering the opinion of the court, says, "that the safety of the people is the supreme law;" not only comports with, but is indispensable to, the exercise of those powers in their public functionaries, without which that safety cannot be guarded. On this principle it is that courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful manda·es; and (as a corollary to this proposition) to preserve themselves and their officers from the approach and insults of pollution.

It is true, that the courts of justice of the United States are invested, by express statute provision, with power to fine and imprison for contempts; but it does not follow from this circumstance that they would not have exercised that power without the aid of the statute, or not in cases, if such should occur, to which such statute provision may not extend; on the contrary, it is a legislative assertion of this right as incidental to a grant of judicial power, and can only be considered as an instance of abundant caution, or a legislative declaration that the power of

*The right to punish for contempts is incidental to a grant of judicial power.*

NEW-YORK, punishing for contempt shall not extend beyond its known and acknowledged limits of fine and imprisonment.

The other case is that of Kearney, in 1822, reported also by Mr. Wheaton, in which the court says : "It is also to be observed, that there is no question here but that this commitment was made by a court of competent jurisdiction, and in the exercise of an unquestionable authority." The commitment in that case was for a contempt of this court in refusing to answer a question as a witness.

But it is objected, that a contempt of court is a crime ; and by the 2d sec. of the 3d art. of the constitution of the United States. "The trial of all crimes, except in cases of impeachment, shall be by jury." The language of the constitution is said to be universal, with a solitary exception, which proves the universality of the rule as to cases not excepted.

The 6th amendment also declares, "that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury," &c. This language is absolutely universal, without excepting even the case of impeachment. And there is not in the original constitution, or the amendment, any exception of cases arising in the land or naval service, or militia, in regard to the right of trial by jury. The 5th amendment only obliges the parties in such cases to answer to accusations for capital or infamous crimes without the previous presentment of a grand jury, but does not deprive them of the right of trial by jury.

By the literal construction of the constitution, all crimes (except in cases of impeachment,) even those committed in the land and naval service, must be tried by jury.— Yet, in practice, these are tried by courts martial, without jury.

But whatever may be the law as to cases arising in the land or naval service, cases of contempt of court have never been considered as crimes within the meaning and intention of the 2d sec. of the 3d art. of the constitution, nor have attachments for contempt ever been considered as criminal prosecutions within the 6th amendment.

From time immemorial, the courts of England, and from the first settlement of this country, the courts here, have claimed and exercised the power to punish contempts in a summary manner. *Contempts have been punished from time immemorial by the courts of England.*

All the courts of the several States, it is believed, were in the full exercise of that power at the time of the formation of the constitution of the United States. It was a power universally submitted to, because every one saw that it was necessary to the very existence of the courts. If the court had not power to commit for a contempt, until the person should have been convicted by a jury, it would be in the power of the party, by a continued interruption of the business of the court, effectually to secure his own impunity, and the power of the court would be perfectly paralyzed. Such being the universal practice and sentiment upon the subject, it cannot be supposed that the makers of the constitution meant to include it in the number of crimes entitled to trial by jury. And that they did not, may be fairly argued from the constructive exposition of the clause of the constitution given by the first congress which sat under its authority. Many members of the convention were members of the first congress, and it cannot be believed that they would have silently acquiesced in so palpable a violation of the then recent constitution as would have been contained in the 17th sec. of the judiciary act of 1789, which authorities all the courts of the United States " to punish by

*The courts of the several States exercised the power at the time of the formation of the constitution.*

*Defined by the judiciary act of 1789, and extended to a single judge in 1802.*

NEW-YORK, fine and imprisonment, at the discretion of the said courts all contempts of authority in any cause or hearing before the same,") if their construction of the constitution had been that which has been in this case contended for at the bar. When the judiciary act was revised in 1801, the same power was given to the courts, and even extended to an individual judge; and when the judicial system was amended in 1802, the same power was continued.

The construction which has been thus universally given to the constitution of the United States, and the acquiescence of the people in that construction, compels

Contempts not crimes within the 2d section of the 3d article of the constitution. us to say that contempts of court are not crimes within the meaning of the 2d sec. of the 3d art. of the constitution of the United States, and that attachments for contempts are not criminal prosecutions within the meaning of the 6th amendment, so as to entitle the party to a trial by jury; and that the power of punishing contempts in a summary manner, as given by the 17th sec. of the act of 1789 to the courts of the United States, is not unconstitutional.

Arguments for the power. The consequences of the want of such a power must be obvious to every reflecting mind. If the laws be not executed, anarchy will be the immediate consequence, and anarchy too often ends in tyranny. If the laws be not respected, it will be difficult, if not impossible, to execute them. Their due execution depends more upon general sentiment than upon the physical power of the government. The same observation will apply to courts of justice. Their power to enforce their judgments depends more on the countenance and support of the good and virtuous portion of society, than upon the power of the executive. In order to obtain that countenance and

support, they must deserve respect; and that court which NEW YORK, may, with impunity, be treated with contempt, will inevitably become contemptible even in the eyes of the good and the virtuous. Their judgments will not be executed, the law will become a dead letter, and fraud and violence will prevail. It is, therefore, of the highest importance to the peace and good order of society that courts of justice should have the power of punishing contempts.

The court have thought it necessary to make these observations, because the doctrines advanced by the highly respectable and eloquent counsel at the bar, seemed to the court to be dangerous, not only to the peace and good order of society, but to the very existence of personal and civil liberty. It is not the right of the court only, but it is the right of the people to cause their courts to be treated with respect. It is the public interest, and not the personal pride of the judges, as suggested at the bar, which claims this power for the courts. As individuals, we claim no more respect than our individual characters deserve; but, as judges of this court, we should betray our trust—we should become traitors to the people, if we did not claim the respect due to a judicial tribunal, and enforce that claim by all the means which the laws allow. And, while the court has means consistent with the dignity of such a tribunal, and sanctioned by the uninterrupted usage of ourselves, our predecessors, and ancestors, for more than six hundred years, it will not condescend to personal conflict with any person who may contemn its authority.

The court, being entirely satisfied of its power to investigate the conduct of its officers, in the mode adopted in the present case, will proceed to consider the facts which, upon this investigation, have been proved to the

NEW YORK, satisfaction of the court, and the judgment which it ought to pronounce.

Charges need not be more specific.
With regard to the charges, we do not think it important that they should be more specific than may be necesseray, in order to give notice of the nature of the evidence intended to be produced, so that the party may not be taken by surprise, and if the court had, upon the hearing, found that he had been taken by surprise, as to any of the charges, we should have given him further time, or have acquitted him of such charge.

Without confining ourselves to the allegations upon which this investigation was grounded, we think the following facts appear to be proved:

That Mr. Burr did cause his name to be entered upon the records of this court, as the attorney of Mr. Crabb, without his consent, with intent to charge him the legal fees of an attorney, but, probably, with an expectation that his assent would be afterwards obtained.

Statement of the facts proved.
That he brought a suit against Joshua L. Henshaw, in the name of Samuel H. Rembert, without the authority of the latter, but under circumstances, which might have led, and probably did lead, him to suppose that he had authority so to do.

That having, in an accidental conversation with John Golding, answered a question of law, put to him by the said Golding, without the attention of consulting him as a counsellor at law, and without the expectation of being made liable for any fee for the answer which Mr. Burr might give: Mr. Burr afterwards employed the said Golding to make two pair of shoes for him, and when the bill was sent for the shoes, Mr. Burr told the messenger that Mr. Golding might sue him as soon as he pleased, and he would supersede it. That Mr. Golding did sue

him before a justice of the peace, and that Mr. Burr, with intent to avoid the payment of the debt, made out an account against the said Golding, charging him five dollars for advice in the matter aforesaid ; and having sworn to it, claimed it as a sett off before the justice, who gave judgment against Golding ; from which judgment he appealed to this court, where the judgment was reversed.

We find that Gen. Van Ness leased a lot of ground, in this city, to Patrick Nicholson, who, being in jail for debt, and about to apply for a discharge under the insolvent act, and Mr. Burr being his counsel and attorney, proposed, by the advice of M. Burr, to surrender the lease to Gen. Van Ness, to whom he was indebted for rent ; that this was done, and the lease given up, with an understanding, but not an absolute engagement, on the part of Gen. Van Ness, that if he realized from the property more than what was due, he would give the surplus to the wife and children of Nicholson ; that Caulfield, the tenant under Nicholson, acknowledged himself tenant to Gen. Van Ness ; that Mr. Burr at the time assured Gen. Van Ness that the surrender of the lease was good and valid, and that the property now belonged to him in justice, in law, and in equity. That when Nicholson appeared before the judge to be discharged, Mr. Burr was his counsel and attorney, and declared before the judge and the creditors that the lease had been surrendered, and that Nicholson had no right or interest in the lot. That the judge, however, at the instance of the creditors, required that Nicholson's interest in the lot should be inserted in his shedule ; which was done, and Nicholson was discharged. That the trustees advertised for public sale all Nicholson's right in the lot ; that Gen. Van Ness

NEW-YORK, attended and forbade the sale, and told Mr. Burr the pro-
perty was entirely his, (Van Ness') and that he, Mr.
Burr knew it. Notwithstanding which Mr. Burr pur-
chased Nicholson's right for six dollars ; and forbade
the tenant to pay the rent to Gen. Van Ness ; but claim-
ed it for his own use, and as often as Gen. Van Ness dis-
trained for the rent, the tenant, by Mr. Burr's advice,
replevied the distress, in one of which actions of replevin,
if not in all, Mr. Burr was his attorney.

That Mr. Burr himself also distrained, and gratuitously
filed a bill in chancery in the name of the tenant
against himself and Gen. Van Ness, praying that both
parties might be enjoined from distraining until the ad-
verse claims of himself and Gen. Van Ness to the rent
should be decided.

We find that a certain Mr. Moulton had rented a house
of Thady Hogan, and that, when a quarter's rent was
about to become due, the goods of Moulton were clandes-
tinely removed from the premises. And that on the same
day, Mr. Burr took a bill of sale of them, and claimed
them as his own, and when they were distrained by Ho-
gan, replevied them in his own name.

We find that Mr. Burr, being the attorney of Patrick
Nicholson, and Joseph Johnson being a creditor of said
Nicholson, Mr. Burr, upon the promise of Johnson to
give him one half of the amount of his claim, which was
upwards of twenty dollars, if he would tell him how he
should get his money, told Johnson that if he would levy
his execution upon certain property, he would get it ; but
directed him not to let Nicholson know that he had given
him this information. That Johnson got only nine dol-
lars of his claim. That Mr. Burr afterwards demanded
of Johnson his fee, telling him that he lost his money by

not levying his execution upon a mare claimed by Mr. Carbery. That after Nicholson had run away, when Johnson attempted to levy his execution on Nicholson's goods, he was forbidden to do so by Mr. Burr; who claimed the whole by virtue of a mortgage given by Nicholson to secure the fees due by him to Mr. Burr as his counsel. That the consideration stated in the mortgage was 50 dollars. That Mr. Burr offered to take 20 or 25 dollars, rather than go to law, or have trouble about it ; and that his claim was about 30 dollars.

As we understand that suits are depending, in which a jury is to pass upon the moral complexion of the facts stated in these three last cases, (viz. those of Gen.Van Ness, Thady Hogan, and Joseph Johnson,) we shall, at present, draw no inferences from them.

We find that Mr. Burr, being counsel for Robert Hoye, who was imprisoned upon a charge of murder, sent for some of the witnesses of the United States before the trial, and examined them in his office ; and, finding that one of them, Robert Gray, was a material witness against the prisoner, he told the witness that it would be better if he would be absent from the trial ; and advised him to conceal himself for a few days. That the said witness having been recognized with surety to appear and testify, his surety being apprehensive, from circumstances, that the witness was about to run away, brought him into court and surrendered him in discharge of his recognizance. That, while the surety was bringing up the witness to surrender him, Mr. Burr told him that if he was surrendered, the court would take his own recognizance, That, upon his surrender, the court, upon the motion of Mr. Burr, was about to take the witness' own recognizance without surety ; one of the judges being of opinion

that no witness ought to be imprisoned for want of se-
curity for his appearance, unless there was strong rea-
son to apprehend that he would run away. That the
court being satisfied from inquiry that there was reason
to apprehend that the witness would not appear to tes-
tify at the trial, refused to discharge him without security
for his appearance ; and, as the witness was unable to
give it, he was committed. That the advice so given by
Mr. Burr to the witness to absent himself from the trial
was given with intent to obstruct the due administration
of justice, and in violation of his oath a s an attorney of
this court. We find that Mr. Burr, being the counsel of
John Free, who was indicted for the murder of his wife,
and while the said Free was in prison upon that charge,
executed an instrument of writing to Mr. Burr, and ac-
knowledged it before two justices of the peace, in the
manner in which deeds for land are required by law to
be acknowledged. During the investigation of that mat-
ter before the court upon the present enquiry, Mr. Burr
admitted that he had received from Free a power of at-
torney to take possession of his property to preserve it,
that it might not be destroyed or wasted by his children
during his imprisonment, and Mr. Burr's language left
the court under the impression that that power of at-
torney was the only instrument which Free had executed
to him, and was the same which had been acknowledged
before the two justices. He stated, that finding upon in-
quiry that the property remained much in the same con-
dition in which it was left by Free, he had not taken
possession of the property, and had thrown by the power
of attorney, and did not know whether he could find it.
The court expressed a strong wish to see the instrument
which had been acknowledged by Free before the two

magistrates, as it might prevent any unfavorable impression which might be made upon their minds by its suppression. Mr. Burr did not, at that time, say that he had destroyed it ; nor did he intimate that it was a deed given by Free to enable him to indemnify Free's bail, if Free should be admitted to bail. Some days afterwards, Mr. Burr produced to the court a power of attorney from Free to him, authorizing him to take charge of his personal estate and papers, and stated to the court that it was the power of which so much had been said. But it was not acknowledged before the two justices. Mr. Burr then, for the first time admitted that the instrument which had been so acknowledged, was a deed from Free to him conveying all his property ; but stated that its only object was to enable him to indemnify the bail of Free in case he should be admitted to bail; that afterwards finding, upon inquiry of Mr. Bussard, that Free could not be bailed, he had destroyed the deed.

Since the investigation which took place upon the present subject of inquiry, transaction has occurred which ought not to be passed over by the court.

In the year 1819, one Simon Meade died, largely indebted, and leaving a considerable real estate, which, together with his personal estate, was, at the time of his death, supposed to be more than sufficient to pay all his debts. The personal estate, alone, was insufficient, and Mr. Griffith Coombe, and other creditors, brought a suit in chancery, against the widow and heirs of Mr. Meade, to charge the real estate with the deficiency of personal assets. This bill was answered by Mrs. Meade in her own right, and also as guardian for her infant children. Her answers were sworn to by her, one of them before Mr. Overton Carr, a commissioner appointed by

the court for that purpose, and the other, first before Mr.
Forrest and afterwards, (the answer having been, on the
same day amended,) it was sworn to by her again be-
fore Mr. Varnum.   The court decreed a sale.   The prop-
erty was sold by Mr. Joseph Forrest, the trustee ap-
pointed by the decree, and who also holds the office of
auditor of the court, an office analagous to that of a mas-
ter in chancery.   Two public sales were made, at both of
which the widow, Mrs. Meade, attended personally and
purchased a house and lot, which she afterwards sold to
a profit.   By her answer she had agreed that her right
of dower should also be sold, and agreed to take a pro-
portion of the proceeds of sale in lieu of her dower.  Since
the sales she has often applied to the trustee to receive
her proportion of the proceeds, which has not yet been
paid to her because the sales have not yet been ratified by
the court, and because she has not accounted for the
personal estate of which she was the administratrix.   On
a motion of this court on Friday last, (June 30, 1823,) by
the solicitor of the creditors, for a ratification of the sale,
Mr. Burr to show cause against its ratification, produced
and read to the court the affidavit of the same Mrs. Meade,
in which she states, " that she has never heretofore given
her authority as such administratrix to any person what-
ever ; nor has she ever disposed of, parted with, or sold
her right of dower to the said estate of the said Simon
Meade, or any part thereof; nor has she ordered any suit
in chancery to settle the same ; nor has she ever con-
sented or known of any suit in chancery commenced by
her for the recovery of any property or demand whatso-
ever from any person or persons ; nor has she ever known
of any suit being commenced against her as administratrix,
or in any other way or manner whatever, except she says

she has lately understood from divers persons, that a suit in chancery had been commenced against her and the heirs of the said Simon, but she does not know for what reason the same was commenced, if the same is true; and that she has never with her consent and knowledge, become a party to any suit in chancery, either in her own right, or as administratrix, or in any other way, capacity, or manner, since the death of her said husband; nor has she, since that period, made answer to any bill in chancery in any capacity or situation whatever; nor has she, by consent or knowledge, made any answer of any kind whatever, by attorney or otherwise; nor has she authorized any persen to be enterested for her as a party to any such suit; nor has she signed her name to any paper, signifying the same to her knowledge; nor has any person for her so done by her authority or approbation."

These allegations being so inconsistent with the record, the court could not but perceive that they were false or that imposition had been practiced upon Mrs. Meade by some person.

It was therefore, deemed necessary to investigate the subject more fully; and, upon that investigation, the court is strongly impressed with the belief that several of the most material allegations in the affidavit are not true, and that Mrs. Meade is in danger of the penalties of perjury.    It appeared that the affidavit had been drawn by Mr. Burr at the request of Mrs. Meade, who furnished him with a written statement of facts, from which, in part, the affidavit was to be drawn; that it was drawn nearly a month before it was sworn to; that Mrs. Meade had employed Mr. Burr as her solicitor to investigate the matter; that Mr. Burr, before the affidavit was sworn

to, if not before it was drawn, had examined, the record and the papers filed in the cause, and was apprized of all the proceedings, and did not warn Mrs. Meade of the danger she was in of committing perjury, if she swore to the affidavit in the positive terms in which it was drawn. In this respect the court think Mr. Burr was, to say the least, extremely negligent of his duty as counsel ; especially as Mrs. Meade appears to be but little conversant with legal proceedings ; and as the facts stated by her, if true, implicate materially the characters of several persons of great respectability.

In support of his general character, Mr. Burr has produced to the court a considerable number of letters, addressed by gentlemen of high standing in society, to the Executive, speaking in very favorable, and some of them in warm terms, of his services, bravery, and good conduct as an officer, during the late war. He also produced testimony of his general good character, previous to his admission to the bar.

In conformity to a rule of this court, which existed on the 11th day of April, 1822, when Mr. Burr was admitted to this bar, but which was shortly afterwards rescinded, a person who had been admitted to practice in the supreme or superior courts of any of the states, was permitted to practice as an attorney of this court, upon his producing satisfactory evidence of his good moral character, without a personal examination as to his knowledge of the law. Under this rule, Mr. Burr was admitted to the bar, upon his producing a certificate of his having been admitted to practice as an attorney in the supreme court of New York.

Upon these facts, the court has, with the utmost anxiety, deliberated upon the judgment which it ought to give.

It is a case in which it is about to exercise one of its discretionary powers, and it is sensible that it is bound by the rules of a sound and legal discretion. On the one hand it considers that Mr. Burr has served his country with reputation, has fought and bled in her defence, and has been discharged from her service with honor. On the other, it is the duty of the court to see that the members of the bar maintain the purity of character of that profession, which Lord Mansfield has justly said, should be free from all suspicion. It is bound to discountenance and to punish every direct attempt, by any of its officers, to obstruct the due administration of justice. And there are standing at this bar, gentlemen of high and honorable character for legal science and for moral and professional integrity, to whom we should do injustice if we compelled them to associate with men of an opposite character.

If there were no other charge against Mr. Burr than **Judgment of** that of an attempt to practice upon the witness for the **court.** United States, in a criminal prosecution, we should think it evinced such a destitution of moral sense ; such an ignorance, at least, of the first duties of an attorney and counsellor of this court ; and such a disregard to the oath he had so recently taken, as to deserve severe reprehension. But when we consider the other facts which are in proof before us, tending to show that the instance which we have already noticed, was not the effect of transient inadvertence, the court will order, that he be suspended from practicing as an attorney in this court for the term of one year, and until the further order of the court ; and as it is probable that a jury will pass upon the cases which we have mentioned, the court will refrain from giving any opinion whether Mr. Burr shall be ultimately

NEW YORK, excluded from the bar, until those cases shall have been decided.